EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JOSÉ ANTONIO TORRES NIEVES, acusado y apelante.

*Número:* CR-76-99        *Resuelto:* 24 de noviembre de 1976

*Rigau & Figueroa,* abogados del acusado; *Roberto Armstrong, Jr., Procurador General Interino,* y *Miguel A. Santana Bagur, Procurador General Auxiliar,* abogados de El Pueblo.

PER CURIAM: Contra el apelante José Antonio Torres Nieves el Ministerio Público formuló acusaciones por dos asesinatos en Primer Grado y por infracciones a los Arts. 6 y 8 de la Ley de Armas imputándole que el día 7 de junio de

1972, con un arma de fuego, ilegalmente dio muerte a sus dos hermanos nombrados Ismaro y Carlos Manuel.

Los casos fueron consolidados y medió renuncia al derecho a juicio por jurado. Ante tribunal de derecho, el apelante hizo alegación de no culpable, renunció el derecho a contrainterrogar cuatro testigos cuyos testimonios, en virtud de una estipulación fueron presentados a través de sus respectivas declaraciones juradas, [1] renunció el presentar testigos favorables a su causa y no declaró. Así las cosas, el caso quedó sometido con dos informes médico-legales y seis (6) fotografías. El tribunal de origen lo declaró culpable de Homicidio Voluntario en los dos casos de Asesinato en Primer Grado y de las infracciones a la Ley de Armas.

Contra la sentencia imponiéndole penas de presidio de 2 a 5 años y de 2 a 3 años en uno y otro de los casos de Homicidio, de 2 a 5 años por la violación al Art. 8 y de 6 meses de cárcel por la infracción al Art. 6 de la Ley de Armas—a ser cumplidas bajo un régimen de libertad a prueba—interpuso apelación atribuyéndole al tribunal de instancia la comisión de tres errores.

## I

Discutiremos conjuntamente los dos primeros que giran en torno a la idoneidad de la prueba.

### PRIMER ERROR

"Insuficiencia de prueba para justificar convicciones por infracciones de los artículos 6 y 8, de Ley de Armas."

### SEGUNDO ERROR

"Insuficiencia de prueba para justificar convicciones por homicidio."

Del análisis integral de las declaraciones juradas presen-

---

[1] Consistente de las declaraciones juradas de Carmen M. Torres y Angelina Nieves de Torres, hermana y madre respectivamente del apelante; de la declaración de Ramonita Soto Amador, vecina; y la del agente de la policía Miguel Ramos.

tadas y del examen de la prueba documental, consideramos probados los hechos que a continuación relatamos.

El 7 de junio de 1972, aproximadamente a las 9:00 A.M., Carmen M. Torres y Angelina Nieves de Torres—hermana y madre respectivamente del apelante—salieron de su hogar ubicado en la Urbanización Las Lomas, Río Piedras, con el propósito de ir al banco, habiendo permanecido en el hogar el apelante en unión a sus dos hermanos Ismaro y Carlos Manuel. Entre las 10:30 y 11:00 A.M., la Sra. Ramonita Soto Amador, vecina del frente de la familia Torres Nieves, escuchó unos sonidos a los cuales les restó importancia por creer que venían de la explosión de unas gomas o la reparación de algún carro en el taller de hojalatería cercano a su residencia.

Alrededor de las 11:00 A.M. Carmen y Angelina regresaron y mientras se disponían a entrar al hogar se encontraron con el apelante parado en la puerta de la cocina, quien dirigiéndose a su madre le dijo que no entrara. Al ésta preguntarle por qué, no recibe respuesta, percatándose de la palidez, sudor y estado de nervios en que se encuentra. Sabiendo que el apelante es gago y viéndolo tan asustado, no espera contestación sino que lo echa a un lado y penetra en la casa, confrontándose con la visión del cuerpo ensangrentado de su hijo Carlos Manuel tirado boca abajo en el espacio del piso entre la puerta de un cuarto y el pasillo. Comenzó a gritar y mientras salía miró hacia el cuarto de su otro hijo Ismaro, viéndolo de igual modo tirado en un charco de sangre en el espacio del centro de dos camas.

Coetáneamente, su hermana Carmen se ha quedado en la entrada de la residencia con los paquetes que traía y le ha preguntado al apelante qué había hecho mientras lo agarraba fuertemente y notaba también que se encontraba sumamente nervioso, pálido y gagueando. El apelante le hizo fuerza y salió corriendo hacia la calle, percatándose durante el forcejeo que estaba como fuera de sí. Inmediatamente Carmen se

le fue detrás gritando que lo detuvieran y que no lo dejaran ir; a la misma vez su madre Angelina salía gritando llamando a los vecinos que fueran a su casa.

Al escuchar gritos, la vecina Ramonita Soto Amador—que había oído antes las explosiones—salió al balcón de su residencia y vio corriendo al apelante con una bolsa en la mano y detrás a su hermana Carmen gritando que lo cogieran. Doña Ramonita cruzó la calle corriendo y se dirigió hacia Doña Angelina mientras Carmen le suplicaba que sacara a su madre de la casa y no la dejara entrar. Luego de haberla sacado, ella entró y vio los dos hijos de Doña Angelina tendidos en el piso, sangrando y que tenían varias heridas en el cuerpo. No vio ningún arma en las manos de los hermanos heridos ni en el sitio o alrededores donde se encontraban.

La policía por conducto del agente Miguel Ramos comenzó y realizó una investigación el día de los hechos aproximadamente a las 12:15 P.M. en el hogar de la familia Torres Nieves. Dicho agente al penetrar en dicha residencia observó que en el fondo del pasillo se encontraba un cadáver que luego resultó ser el de Carlos Manuel; que alrededor del cuerpo habían varios casquillos Western 32 automáticos y varios plomos; que en otra habitación estaba el cadáver boca abajo, sobre un charco de sangre, de Ismaro Torres Nieves, hallándose igualmente a su alrededor varios casquillos y plomos. Del examen de los cadáveres, bolsillos, cintura y manos, no encontró arma alguna.

Las autopsias correspondientes revelaron que Ismaro murió a consecuencia de las lesiones severas que en el área del cráneo-cerebral le produjo una herida de una bala que penetró por la región externa superciliar (ceja) derecha y salió por el ala externa de la oreja izquierda. Carlos Manuel recibió cinco (5) heridas de bala de las cuales tres penetraron de frente hacia atrás en el área de la hemicara derecha (parte superior), hemicara izquierda, y debajo de la clávi-

cula; y las restantes, una en el muslo derecho parte media y anterior y otra en la espalda cuyo orificio de salida es por debajo de la tetilla derecha. La causa del fallecimiento fue severo trauma cráneo-cerebral.

## II

■ La doctrina prevaleciente en nuestra jurisdicción reconoce la necesidad de que el Estado demuestre mediante evidencia directa o circunstancial, o una combinación de ambas, la culpabilidad de un acusado más allá de toda duda razonable. En *Pueblo* v. *Ortiz Rodríguez*, 100 D.P.R. 972, 979 (1972), sintetizamos la clasificación tripartita de circunstancias susceptibles de ser evaluadas y consideradas en la determinación de la culpabilidad de un acusado del siguiente modo:

"(a) circunstancias *prospectivas:* hechos anteriores al crimen y que apuntan hacia su futura comisión (motivo, plan, preparativos, etc.);

(b) circunstancias *concomitantes:* hechos simultáneos al crimen que permiten que se lleve a cabo por el acusado (presencia en el lugar del crimen, acceso a la víctima, etc.);

(c) circunstancias *retrospectivas:* hechos posteriores al crimen que sugieren que el acusado lo cometió (fuga, ocultación de evidencia, etc.)."

■ Adicionalmente señalamos ". . . circunstancias que tienden a probar la inocencia de un acusado, verbigracia, el afecto o amistad entre el acusado y la víctima (prospectiva), la coartada (concomitante) y una conducta normal con posterioridad al crimen (retrospectiva)."; y ". . . el que exista un motivo comprobado para el crimen, tal como el lucro, la venganza o la cólera producida por una riña." Págs. 979, 981–982. Ninguna de estas circunstancias inculpatorias o exculpatorias, por sí solas serán determinantes, sino que la culpabilidad o inocencia quedará expuesta en orden a un ponderado análisis integral de las mismas y de las inferencias lógicas y razonables que pueden derivarse de los hechos bá-

sicos establecidos, y ello siempre con sujeción a la medida de prueba de duda razonable.

■ En lo relativo a infracciones a la Ley de Armas, reiteradamente hemos resuelto que la presentación del arma en evidencia no es indispensable en casos de esta naturaleza, si existen otros elementos o circunstancias que demuestran que el acusado la portaba. *Pueblo* v. *Prieto Vélez,* 93 D.P.R. 102, 108 (1966); *Pueblo* v. *Garcés,* 78 D.P.R. 102, 107 (1955); *Pueblo* v. *Blanco,* 68 D.P.R. 932, 934 (1948); *Pueblo* v. *De Jesús,* 65 D.P.R. 932, 935 (1946); *Pueblo* v. *Guzmán,* 52 D.P.R. 458, 459 (1938); *Pueblo* v. *Carrillo,* 51 D.P.R. 365, 367 (1937); *Pueblo* v. *Ríos,* 41 D.P.R. 764, 766 (1931). No obstante, ". . . en procesos por portar armas, cuando ésta no se presenta, por no haber sido ocupada, la prueba del fiscal debe ser clara y convincente." *Pueblo* v. *Toro Asencio,* 104 D.P.R. 847 (1976); *Pueblo* v. *Olivencia,* 93 D.P.R. 845, 847–848 (1967); *Pueblo* v. *Santiago,* 80 D.P.R. 310, 311 (1958); *Pueblo* v. *Rosario,* 80 D.P.R. 318, 320 (1958); *Pueblo* v. *Oquendo,* 79 D.P.R. 542, 546 (1956); *Pueblo* v. *Pacheco,* 78 D.P.R. 24, 29 (1955); *Pueblo* v. *Garcés,* 78 D.P.R. 102, 107 (1955); *Pueblo* v. *Rupizá,* 72 D.P.R. 744, 746 (1951); *Pueblo* v. *Guzmán,* 52 D.P.R. 458, 459 (1938); *Pueblo* v. *Caro,* 50 D.P.R. 724, 725 (1936); *Pueblo* v. *Cartagena,* 37 D.P.R. 281, 284 (1927); *Pueblo* v. *Scott,* 36 D.P.R. 802, 804 (1927).

■ Hemos confrontado las normas de derecho expuestas con la prueba circunstancial sometida en evidencia e inferencias razonables y no albergamos duda de que la misma demuestra más allá de duda razonable la culpabilidad del apelante por los fraticidios y violaciones a la Ley de Armas.

Los argumentos(²) del apelante consistentes en que su

---

(²) Respecto a que el conjunto de la prueba de los informes Médico-Legal favorece al apelante, valga citar de que su ". . . alegato no . . . pretende sustituir la falta de evidencia pericial con conjeturas del abogado que suscribe." Pág. 8.

permanencia en el hogar y conducta con su madre y hermana fueron con el propósito de evitar que la primera—por padecer de alta presión—entrara a la casa, al igual que su planteamiento respecto a que su huida fue causada por el pánico generado en ". . . (1) haber visto los cadáveres de sus hermanos, (2) la inhabilidad de comunicar y (3) la acusación y los actos de su hermana", no nos convencen. No existe ningún indicio en la prueba de que alguna tercera persona penetrara en el hogar y diera muerte a las dos víctimas. Por el contrario, la prueba directa no contradicha revela que el único que permaneció en el lugar de los hechos y continuaba allí recien ocurridos los disparos fue el apelante; si estaba antes y después, es lógica la deducción de que estaba durante la muerte de sus dos hermanos.

Distinto a su tesis, estimamos inculpatorias las actuaciones referentes a impedir la entrada a su madre y hermana, y su fuga. En primer lugar, el argumento implica un conocimiento previo de los homicidios. No se desprende de la prueba que él supiera o tuviera una idea de cuando sus familiares regresarían, situación compatible con que en realidad fuera por éstas sorprendido mientras se disponía a huir. A ello abona que no es lógico inferir que conociendo que sus hermanos estaban tirados en el suelo, desangrando o sangrando profusamente, optara por esperar a su madre en ánimo de evitarle el confrontamiento con la tragedia, en lugar del acto humano de buscar ayuda de sus vecinos o médica.

Respecto al elemento de fuga, aun cuando hemos estimado ". . . válido el argumento de que un inocente preso del pánico, puede traducir su terror a fuga . . .", *Pueblo* v. *Báez Cintrón*, 102 D.P.R. 30, 35 (1974), el mismo se debe examinar a la luz de las circunstancias en que la misma ocurre. El señalamiento en el caso de autos de que su fuga fue el producto del pánico se desvanece al confrontarlo con el hecho probado de que huía con una bolsa en las manos; en la cual, en vista de

los disparos, los casquillos y plomos de bala y demás circunstancias, coincidimos con la inferencia de la Sala Sentenciadora de que transportaba el arma homicida que oportunamente dispuso.

■ Establecido el hecho de la portación ilegal, debe deducirse también la *posesión* prohibida, pues ". . . en casos de portación o posesión ilegal de armas de fuego el fiscal no viene obligado a probar que el acusado no tenía licencia con tal fin, cuando se ha alegado tal hecho en la acusación y se ha probado la portación o posesión del arma, ya que en ellos surge la presunción de portación o posesión ilegal y es al acusado a quien incumbe destruir tal presunción." *Pueblo* v. *Pacheco*, 78 D.P.R. 24, 30 (1958).

■ Finalmente, la ausencia de prueba específica con relación al motivo o génesis de esta tragedia familiar, en la totalidad de los hechos probados no milita en contra de la convicción del apelante. Hemos resuelto que no es imprescindible la presentación de dicha prueba, sin que ello implique que no se produzca de estar disponible. *Pueblo* v. *Ortiz Rodríguez,* supra, pág. 981. Debe tenerse presente que el caso se sometió a base de declaraciones juradas, en particular las de la madre y hermana, quienes se encuentran ante la encrucijada de atestar en contra del hijo y hermano homicida y condenarle a una muerte civil. Ante este cuadro humano es fácil apreciar el trámite del caso y la razón por la cual el Estado no produjo prueba de motivación. (³)

## III

*TERCER ERROR*

"[La] renuncia y dispensa por ambas partes ꞏde todos los procedimientos legales del juicio constituye una violación del debido proceso ꞏde Ley."

---

(³) Debe señalarse que el Juez Sentenciador redujo los delitos de Asesinato en Primer Grado a Homicidio Voluntario.

■ La argumentación del apelante en el sentido de que por haber renunciado a varios de los trámites(⁴) durante el juicio se violó el debido procedimiento de ley no es meritoria. Basta recordar que todos estos derechos de índole constitucional o estatutarios son renunciables. Cuando se trata de la total abdicación de los mismos, esto es, registrar una alegación de culpabilidad, la renuncia por un acusado debe ser expresa, personal, voluntaria e inteligente: *Díaz Díaz* v. *Alcaide*, 101 D.P.R. 846 (1973); y de igual modo la renuncia a juicio por jurado: *Pueblo* v. *De Jesús Cordero*, 101 D.P.R. 492 (1973); *Pueblo* v. *Delgado Martínez*, 96 D.P.R. 720 (1968) y *Pueblo* v. *Juarbe de la Rosa*, 95 D.P.R. 753 (1968).

■ En torno al discurso de apertura por el Ministerio Fiscal y la Defensa, valga apuntar que el caso de autos fue ventilado ante Tribunal de Derecho y no por jurado. Aun en estos últimos casos, hemos rechazado que la exposición de las teorías por las partes sea un requisito de estricto cumplimiento cuando no se ha demostrado perjuicio sustancial al acusado, y además, que debe ser expresamente invocado ante el tribunal de instancia y no por primera vez en apelación: *Pueblo* v. *Del Valle*, 91 D.P.R. 174, 181–182 (1964). Bajo la derogada regla 233 del Código de Enjuiciamiento Criminal (34 L.P.R.A. sec. 712) ya habíamos señalado que ello no era mandatorio. *Pueblo* v. *Rodríguez*, 67 D.P.R. 250, 251 (1947).

■ Respecto al derecho a confrontarse y contrainterrogar los testigos de cargo, por su naturaleza y rango cons-

---

(⁴) Con referencia a los siguientes trámites: Regla 128 de las de Procedimiento Criminal, sobre el discurso de apertura por parte del Ministerio Fiscal y a la exposición concisa de los medios de defensa del acusado; el derecho del fiscal a interrogar a sus testigos y del acusado a contrainterrogar: Código Enjuiciamiento Criminal, Art. 11 (34 L.P.R.A. sec. 11); Regla 131 sobre el derecho del acusado a que el testimonio de los testigos sean orales; el derecho del acusado a presentar testigos a su favor: Cód. Enj. Criminal, Art. 11 (34 L.P.R.A. sec. 11); Regla 111 sobre el derecho del acusado a ser juzgado por un jurado; y Regla 136 sobre las partes efectuar sus respectivos informes o resúmenes de evidencia luego de terminada la presentación de la prueba.

titucional hemos reconocido que un acusado no puede ser privado del mismo cuando lo invoca: *Pueblo* v. *Pacheco Padilla*, 92 D.P.R. 894, 897–898 (1965) y *Pueblo* v. *Rosado Alvarado*, 89 D.P.R. 875, 880–881 (1964); sin embargo ello no significa que no sea irrenunciable y por ende, hemos decidido—vigente nuestra Constitución—que es válida una renuncia de dicho derecho a través del abogado en virtud de una estipulación sometida sin que conste el consentimiento expreso del acusado. *Pueblo* v. *Vargas*, 74 D.P.R. 144, 147–150 (1952). En su consecuencia, igual solución se impone en cuanto a que los testimonios sean orales y el derecho del acusado a presentar sus propios testigos.

En cuanto a la renuncia sobre el resumen de prueba, hemos resuelto que es renunciable sin la exigencia de que sea por el acusado personalmente. *Pueblo* v. *Nazario Nieves*, 100 D.P.R. 232, 236–238 (1971) y *Pueblo* v. *Alicea Cruz*, 100 D.P.R. 295, 298 (1971).

La lectura de la transcripción de evidencia en el caso de autos refleja indubitadamente que el apelante, estudiante universitario de tercer año de la Facultad de Humanidades, renunció válida y eficazmente a los derechos constitucionales y estatutarios antes relacionados. Concluimos que el tercer error tampoco fue cometido.

*Se dictará Sentencia confirmatoria.*

El Juez Asociado Señor Rigau se inhibió y el Juez Asociado Señor Díaz Cruz concurre en el resultado sin opinión.